Chief Justice Watkins delivered the opinion of the Court. The appellant was indicted for an attempt to commit a rape upon a white woman. The indictment charges “that Pleasant, a negro man slave, the property of one James Milton, on the twenty-ninth day of November, in the year of our Lord one thousand eight hundred and fifty one, with force and arms, in the county of Union aforesaid, upon one Sophia Fulmer, the said Sophia Fulmer, then and there, being a white woman, in the peace of the State, then and there being, wilfully and feloniously did make an assault, and her, the said Sophia, did, then and there, beat, wound, and ill-treat, with intent, her, the said Sophia Ful-mer, violently, forcibly, and against her will, then and there, fe-loniously, to ravish and carnally know, and other wrongs, to the said Sophia Fulmer, then and there, did, contrary,” &c. The second count of the indictment is substantially the same. After his motion for new trial was overruled, the defendant moved in arrest of judgment, because of the insufficiency of the indictment, and that it disclosed no offence in law. We consider the offence well and sufficiently charged, and free from the objections existing to the indictment in the case of Joe v. The State, 3 Eng. 400. On the trial, the accused was found guilty, and sentenced to be hung. Before proceeding, to notice such portions of the record before us, as relate to the alleged errors in the conviction, we have to observe that the indictment is based on the statute, Digest Title, Crim. Law, Art. 4, sec. 9, which makes it a capital offence for any negro or mulatto to attempt to commit the crime of rape on a white woman. The constitutionality of this law, is fully sustained in the case of Charles v. The State, 6 Eng. 390, where the question was made, whether a slave could' be punished capitally for an offence, which, if committed by a white man, would subject him to confinement in the penitentiary. The crime of rape is, in all cases, punished with death; but here the gist of the of-fence is, that the attempt was made by a negro upon a white woman. The fact that she is a white woman, is a necessary ingredient to constitute the offence, and the averment that she is so, becomes part of the substance of the issue material to be found. Further, it is to be observed that, while our law justly regards the crime of rape, no matter by whom, committed, with the utmost abhorrence, so much so, and more especially in view of the relation of master and slave, that the bare attempt by a slave is punished with death, the rules of law, in respect of what constitutes the offence, and the evidence to establish it, are not changed because of that relation. The principal witness, for the prosecution, proved that she was the Sophia Fulmer mentioned in the indictment, and upon whom the assault was committed. Apart from this, and a reference, in the course of her testimony, to her “husband,” and again to her “brother,” there is no evidence of her being a white woman, and in order to find her to be such, the jury must have inferred it from those expressions, or from her appearance, when she testified before them. This witness stated that the accused rode up to her house, where she, as it appeared, was alone. After helping himself to a drink of whiskey, he commenced taking indecent liberties with her person. Without going into the details of her testimony, it is sufficient to say that if the jury believed it, as the verdict shows they did, no room is left for doubt as to the brutal and aggravated character of the assault, and of the prisoner’s intention to have carnal knowledge of her forcibly, and against her will. The offence is clearly made out, and all the material averments of the indictment are sustained ’by her testimony, unless it be the averment that she was a white woman. The of-fence of rape <was not consummated; because, after she had been thrown down, and her clothes stripped over her head, so as in a manner to smother her, she continued to struggle and resist, so that the accused could not accomplish his purpose within her person; but, after a time, he appeared to have satisfied himself, and desisted, when he left, and she immediately ran to the nearest house, which was a mill, about half a mile off, to tell one Sanders and her brother what had occurred. The witness, Sanders, returned with her to the house, and his testimony corroborated hers, as to her agitation, the torn appearance of her dress, and the confusion of the bed clothes about the floor, indicating that a struggle had taken place, as she had described it. The witness, Sophia Fulmer, on her cross examination, denied that she had had sexual intercourse with the witness, Sanders, or with any person other than her husband. The defence then asked her, if she had not proposed, before the institution of this suit, to take from James Milton, two hundred dollars not to prosecute the prisoner, his slave — to the answering of which the State, by her attorney, objected, and the objection being sustained, the accused excepted. The witness, Sanders, before referred to, in addition to what has been said of his testimony, stated that he had lived at the house of Fulmer, for about two years, and kept the mill: that on the morning in question, the prisoner passed by Fulmer’s, on his way to the mill, and having got his bag of meal, started home by the way of Fulmer’s; and, not long afterwards, the prosecutrix came to the mill, as before described. This, witness denied, that he had had any criminal connection with the prosecutrix, or that he had been caught in any improper situation with her. Subsequently, a witness testifying to a circumstance calculated to raise a suspicion of improper intercourse' between Sanders and the prosecutrix, he was allowed to be recalled in order to explain it. Willingham, a’ witness for the de-fence, stated that, hearing of the occurrence, he went to Fulmer’s without Milton being privy to his going, to see what was the matter. Fulmer said that if Milton had given up his negro to be whipped, he should not have prosecuted, that he would not have had the thing to have happened for two hundred dollars. The witness then asked him if he would take two hundred dollars not to prosecute the negro. After some consultation between Ful-mer, his wife and Sanders, they agreed to take the two hundred dollars, part of which was to go to Sanders, in payment of a debt which Fulmer o wed him, and the balance to be given to Mrs. Ful-mer, to be laid out in the store. This proposition he carried to Milton, who they requested should come the next day. When Milton came, he objected to giving two hundred dollars for the release of the negro, or for them not to prosecute the suit; they then agreed to take one hundred and fifty dollars, which Milton refused to give; they then agreed to take one hundred and twenty-five dollars, and this Milton agreed to, but the money was not paid. The witness stated that Fulmer was a very poor man, and very lazy. The defendant asked the court for eighteen instructions; all of which the court gave, except the first, second, fourth, fifth, eighth, twelfth, fifteenth and eighteenth. The instructions given were sufficiently favorable for the accused, except one, possibly the very last charge which the prisoner, in his condition, should have asked for, and that was “that the jury are the judges of the law and the evidence.” If the court had charged the jury that they were bound to receive the law, when given, from the court, but that in cases where the issue involves a mixed question of law and fact, they are necessarily the judges of the law and testimony, because they must apply the law to the testimony, in order to determine the criminal intent with which the act was done, it would have saved, to the defendant, the full benefit of his right to an impartial trial by jury, and the court would, at the same time, have maintained its own dignity, and its constitutional authority. If, in any case, the jury are subject to the outside pre-sure of popular excitement, against the accused, the right of the court to declare what the law is, and the duty of the jury so to receive and apply it to the facts they find to be proven, may be the only shield and protection that are left to him. The case here does not call for any discussion of the proposition that the jury are the judges of the law and the evidence. Supposing it to be an error, it is one of which the appellant cannot complain, and we only notice the charge, because, if taken in the literal and commonly received acceptation of the terms used, it becomes a heresy that is subversive of all law. The first instruction asked for by the counsel for the accused, to the effect that in order to find him guilty, the jury must be satisfied that when he had hold of Mrs. Fulmer, he not only desired to gratify his passions upon her person, but that he intended to do so, at all events, and notwithstanding any resistance on her part, was properly refused, because calculated to mislead the jury; and even if abstractly good law, or when properly applied to a case made in evidence, it was no error to the prisoner to refuse it, because the same charge, in substance, was given by the court. The language of that instruction was used by this court in the case of Charles v. The State, on the authority of the cases there cited, where the question arising on the facts, was between fraud and force. The better authority would seem to be, that if the man accomplish his purpose by fraud, as where the woman supposed he is her husband, or obtained possession of her person by surprise, without intending to use force, it is not rape, because one of the essential ingredients of the offence is wanting. So where force is used, but the assailant desists, upon resistance being made by the woman, and not because of an interruption, it could not be said that his intention was to commit rape. We are bound to declare that this is the law applicable to negroes; but whether there should not be an amendment of the statute so as to punish, as a distinct offence, and more severely than it can be, under existing laws, the carnal knowledge of a white woman by a slave, or the attempt of it, by fraud, and without force, or the attempt without consummation in consequence of her resistance, is, in our opinion, worthy of the serious consideration of the legislature. In the case of Charles, it seemed quite plain, from the testimony, and all the surrounding circumstances, that his intention was to obtain possession of the girl’s person while she was asleep, or to have connection with her, if he could do so by her conset; and, therefore, the court properly applied the law, that in order to convict him of an assault with intent to commit a rape, it should appear that he intended to gratify his passion upon her person, at all events, and notwithstanding any resistance on her part — in other words, that his intention was to have carnal knowledge of her by force, and against her will. It never was the design of .the expression used, either in respect of the crime, or the attempt, to measure the quantum of brute force, or the amount of resistance. If the woman submitted, from terror, or the dread of greater violence, the intimidation becomes equivalent to force. The fourth instruction needs no special notice. The prosecu-trix here swore to facts, and not to a conclusion of law. The fifth instruction w.as properly refused, and is not understood to be urged here in argument. And so of the eighth. The twelfth instruction, to the effect that taking a woman and throwing her about on the floor, and then throwing her on the bed, for the sole purpose of having criminal connection with her, is not an attempt to commit rape, was properly refused, because, in the terms asked for, it was calculated to mislead the jury. Of course, if all that was done with the woman’s consent, it would not be an attempt to commit rape, and this was fully explained to the jury by other instructions given. The fifteenth instruction was, that the jury cannot convict the prisoner unless he is proven to be a negro, and the property of James Milton; and though he be black, their seeing him is no proof that he is a negro, and that the jury can only act upon what is in proof before them by testimony, inasmuch as this instruction assumed the prisoner to be black, the presumption arising from color would prevail, and it was properly refused. Apart from this, and though it was essential for the State to prove the allegation in the indictment, that he was a negro, the proof as to this fact, and that he was the slave of James Milton, is clear and explicit, and on the motion for new trial, it cannot be intended that the prisoner was injured. So far as the refusal to give this instruction is concerned, the motion for new trial was properly overruled. The eighteenth instruction asked for, was that if the prosecu-trix swore that she had not illicit intercourse with the witness-, Sanders, and the jury believed that she had such intercourse, they are warranted in disregarding her evidence. Unless the jury suspected this, or had some means of knowing the fact outside of the testimony, we find nothing in the proof, upon which such an instruction could be based. The court refused to give the second instruction asked for, on behalf of the prisoner, which was, in substance, that the jury should acquit him unless the State proves, to their satisfaction, that the person upon whom the assault was committed is a white woman, and that the jury having seen her, or known her, or head her testify, will not dispense with proof of that fact. On the other hand, the court charged the jury, on behalf of the State, that if they helieye, from the testimony, that the prisoner assaulted Sophia Fulmer, with intent to carnally know her forcibly, and against her will, and that the said Sophia Fulmer is a white woman, they should find him guilty. Although this last instruction, by itself is right, and though we may entertain a strong moral conviction that the prosecutrix is a white woman, as found by the jury, yet considering the effect of the instruction refused, and the one given, we must conclude that it amounts to an error against the accused, for which a new trial should be awarded, and for these reasons. The essence of this offence, committed by a negro, in order to make- it capital, is that the attempt is made upon a white woman, and this is part of the substance of the issue to be proved by evidence, oral or written. True, the jury have the advantage of inspection. They may, by the discretion of the court, if convenient, and in proper custody, be allowed to visit the locality of a homicide, or of any res gestee, if, by so doing, they can better understand the testimony. They inspect the instrument of a homicide, and so the appearance of the different witnesses is matter for their observation! If, in this case, there had been conflicting testimony as to the prosecutrix being a white woman, the inspection of her by the jury, might determine their verdict, one way or the other. In all such cases, the inspection is not testimony, but comes in aid of the testimony; and because there is no mode of putting it upon the record, the result is a presumption in favor of the truth of the finding by reason of those aids which the court of errors cannot have. Some testimony of her being a white woman was necessary. Her own statement, to that effect, or that of any witness who knew her, though matter of opinion founded on her appearance, might be sufficient to satisfy the allegation of the indictment. So the proof of venue is held to be material, and the omission of it, is error, though every juror may know that the offence was committed in the county. In this case, the prisoner might have rebutted any evidence of the prosecutrix being a white woman by proof that her grandfather or grandmother was a negro; if so, under sec. 1 of ch. 75, Dig., she would be a mulatto, and the prisoner could not be convicted capitally. But until the State makes out her case in testimony, the accused need not prove himself clear of the charge. The instructions, as given and refused, must have conveyed, to the mind of the jury, the idea that they could find the fact of the prosecutrix being a white woman by inspection, while we know that, in many instances, a fair complexion is not inconsistent with the taint of negro blood. Even supposing that in the absence of direct testimony, the jury could have inferred the fact of her being a white woman, from indirect expressions in the testimony which implied her to be such, still if the attention of the jury had been drawn to those expressions, they might have doubted their sufficiency. This court is constrained to give the accused the benefit of the doubt in our minds as to the correctness of this ruling. The second instruction, asked for by the State, was properly given. We recur now to the question to the prosecutrix, on her cross examination, if she had not proposed, before the institution of the proceedings, to take from James Milton two hundred dollars not to prosecute the prisoner, his slave. Probably there is no branch of the law of evidence, about which there is so much confusion in the authorities, or where so much seems to depend upon the discretion of the judge at the trial, varying with the circumstances of each particular case, as in questions of this description. We cannot regard the inquiry here, as altogether foreign, or collateral to the matter in issue, which the witness may refuse to answer, but it tended to elicit her disposition and motives concerning this very prosecution. True, the character and conduct of the woman, in prosecutions for rape, are not supposed to be put more directly in issue, as they are in actions for crim. con, or seduction; because, no matter how abandoned the female may be, she is still entitled to the protection of the law, which, in all cases, regards him who violates her as a monster. But, at this day, as in the time of Sir Matthew Hale, it is to be remembered, that rape, though a detestable crime, “is an accusation easily to be made, and hard to be proved, and harder to be defended by the party accused: though never so innocent.” The language of the court, in the case of The People v. Hulse, (3 Hill 317,) is much in point. It is there said, that “ cases of this character do not call for any relaxation of the rules of evidence for the purpose of supporting the accusation. On the contrary, courts and juries cannot be too cautious in scrutinizing the testimony of the complaining witness, and guarding themselves against the influence of those indignant feelings which are so naturally excited by the enormity of the alleged offence. Although no unreasonable suspicion should be indulged against the accuser, and no sympathy should be felt for the accused, if guilty, there is much greater danger that injustice may be done to the defendant, in cases of this kind, than there is in prosecutions of any other character.” Where the woman swears positively to the offence, and more especially if corroborated by other testimony, showing the accused to have been in a situation to commit it, his chief reliance, if innocent, must consist in impeaching the credibility of the principal witness against him. Whether the parties may have supposed this offence was one that could be compounded by the master, under secs. 4 and 5 of Part 12 of Criminal Code, we cannot know. If the court proceed upon the ground that the answer to the question would tend to criminate the witness,, and to convict her of an offence, i. e., compounding a felony, distinct from the one on trial, the ruling, if the ground of it existed, was right; but the mere proposal, unless the proof of it would lead to further proof that the felony was compounded, would not amount to an offence, so as to excuse the witness from answering; nor could she refuse merely because the answer might tend to degrade her. In any view, the State could not object; the exemption from answering any question tending to criminate, being personal to the witness, who, if he choose, may answer after being informed by the court as to his privilege. With this qualification, we think the question was proper to be answered — not to excuse or extenuate the offence, if committed, but to impeach the credibility of the main witness, as to the fact of its commission. If answered in the affirmative, the jury might possibly have inferred, from her own estimate of the injury alleged to have been committed, that it was not worth the forfeit of a human life:, or that the motive being mercenary, her story may have been in whole, or in part, a fabrication. If, however, the object of the defence was to impeach her credibility in case she denied the offence, by calling witnesses to prove that she made it, her testimony could, not have been so impeached unless the question to her had indicated the persons to whom the offer was supposed to be made, with reasonable certainty of time and place. True, the prosecutrix, if allowed to have answered the question, may have denied or explained it. Even if admitted by her, the jury may have attached but little consequence to it, because a witness for the defence did prove that Fulmer agreed to take one hundred and twenty-five dollars not to prosecute, and this upon consultation with the prosecutrix. Whether in that she was influenced by Fulmer, does not appear, beyond the presumption of law, that the wife is under the dominion of the husband. The inquiry was as to an offer of her own, and because we cannot know what influence the answer may have had upon the jury, the refusal of the court to allow her to answer it, was erroneous. We have noticed all the errors assigned for the refusal to grant a new trial, except that part of the motion based on newly discovered evidence, supported by the affidavit of Milton. Without going into a detail of the evidence claimed to be newly discovered, or its relevancy, we may say, in general terms, that such applications are to be received with caution, and this, in proportion to the magnitude of the stake involved. The application should be corroborated by the affidavits of other persons; and, if possible, those of the newly discovered witnesses themselves. There is, however, one objection fatal to the application: although Milton swears that he did not know of the existence of the testimony, in time to have brought it forwarded on the trial, no excuse or accident is stated to show that he might not have ascertained it by the exercise of reasonable diligence. For the error of the court, in refusing, on the objection of the State, to allow the prosecutrix to answer the question asked her by the accused, if she had not proposed to take of Milton two hundred dollars not to prosecute herein; and also for the error in refusing to charge the jury that, in order to find the accused guilty, they must be satisfied, from the testimony, apart from their individual knowledge or 'belief, that the Sophia Fulmer mentioned in the indictment, is a white woman, the judgment, in our opinion, ought to be reversed, and a new trial awarded. The transcript, in this case, omits the empanneling and the names of the grand jury. If that were the only error appearing, this court would ex-officio have awarded a certirari for the affir-mance of the judgment.